IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

JUDITH M. WINES,                            )
                                            )
            Plaintiff,                      )
                                            )
    v.                                      )        CIVIL ACTION NO. 1:10CV948-SRW
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security,            )
                                            )
            Defendant.                      )

## MEMORANDUM OF OPINION

Plaintiff Judith M. Wines brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a decision by the Commissioner of Social Security ("Commissioner")

denying her application for a period of disability and disability insurance benefits under Title

II of the Social Security Act.  The parties have consented to entry of final judgment by the

Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  Upon review of the record and briefs

submitted by the parties, the court concludes that the decision of the Commissioner is due

to be affirmed.

## BACKGROUND

Plaintiff completed ninth grade in 1977 and has worked as a cleaner and head

housekeeper at hotels, as a dishwasher at a hospital, and as a stocker at Walmart.  (R. 33-34,

119,151).  She filed the present application on September 22, 2008, when she was forty-

seven years old, alleging that she became disabled on February 9, 2008, due to back pain.

She reported that she "was terminated from [her] job due to frequent absences because of

[her] back pain." (R. 94-98, 109-10, 114).  She indicated that she cannot walk, stand, or sit for prolonged periods of time; bend; or lift or carry anything of weight due to constant pain in the middle of her back that radiates down her legs and numbness and weakness in her legs. She also reported that she has difficulty sleeping due to her constant pain. (R. 114).

After plaintiff's claims were denied initially, plaintiff requested a hearing before an ALJ, which was held on November 20, 2009. (R. 28-45, 46-52, 56-57). The ALJ issued a decision on December 18, 2009, concluding that plaintiff has severe impairments of "degenerative disc disease, mild scoliosis, cystitis, anxiety, depression, psoriasis, dysparesis, fatigue, gastric ulcer disease, mononeuritis multiplex, gastro-esophageal reflux disease (GERD), mild arterial venous disease, insomnia, angina with normal coronary arteries (ANCA)/cardiac syndrome, chronic obstructive pulmonary disease (COPD), esophagitis, and panic disorder[.]" (R. 11, 23).  The ALJ determined that plaintiff's impairments, considered in combination, do not meet or medically equal a listing. (R. 13).  She found that, as a result of her impairments, plaintiff is limited to less than the full range of sedentary work, with additional mental non-exertional limitations. (R. 15).  The ALJ concluded that, while plaintiff's RFC precluded performance of her past relevant work, there are other jobs existing in significant numbers in the national economy that plaintiff can perform and, therefore, that plaintiff was not disabled from her alleged onset date through the date of the ALJ's decision. (R. 21-22).[1]  Plaintiff sought review of the ALJ's decision by the Appeals Council, which

---

[1]  The ALJ found that plaintiff's date last insured is December 31, 2013.  (R. 11).

denied review on September 16, 2010, leaving the ALJ's unfavorable decision as the final decision of the Commissioner.  (R. 1-4).  Plaintiff filed the present appeal on November 5, 2010. (Doc. # 1).

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff raises two issues in her appeal to this court:

1.  The ALJ erred "in failing to accord adequate weight to the opinion of [plaintiff's] treating physician, Dr. Chandler."

3

2.  The ALJ "failed to properly apply the two part pain standard."

(Plaintiff's brief, p. 6).

The Eleventh Circuit's Pain Standard

In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).  If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms.  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).  Although the ALJ is required to consider the testimony, the ALJ is not required to accept the testimony as true; the ALJ may reject the claimant's subjective complaints. However, if the testimony is critical, the ALJ must articulate specific reasons for rejecting the testimony.  Id.[2]  "The

---

[2]  See also Social Security Ruling 96-7p, 61 Fed. Reg. 34483-01 (July 2, 1996):

When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.  The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply

credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." Dyer, *supra*, 395 F.3d at 1210 (citations and internal quotation marks omitted).

Plaintiff argues that the evidence of record "satisfies the requirements of section (2)(b) of the pain standard" and, accordingly, that "the ALJ erred in failing to find that [plaintiff's] objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain." (R. 14).[3] In the present case, however, the ALJ found that the evidence satisfied the requirements of the pain standard, *i.e.*, "that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms[.]" (R. 16). Thus, plaintiff's argument that the ALJ erred by failing to find that the evidence satisfied the requirements of the pain standard is without merit.

After finding that pain standard requirements were satisfied by the evidence of record, the ALJ concluded that plaintiff's allegations regarding "the intensity, persistence, and limiting effects" of her symptoms were not fully credible. As she was required to do in this

_____

to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

[3] Plaintiff's reference to "section 2(b) of the pain standard" describes what the court has identified above as the third part of the pain standard – *i.e.* that the "objectively determined medical condition is of such a severity that it can be reasonably be expected to give rise to the alleged pain." (See p. 4, *supra*, quoting Dyer, 395 F.3d at 1210)(internal quotation marks omitted).

circumstance, the ALJ stated her reasons for declining to credit plaintiff's testimony fully.

(R. 16-21). Plaintiff does not discuss any of the reasons articulated by the ALJ for her

credibility determination and does not challenge those reasons expressly. (See Plaintiff's

brief, Doc. # 11, pp. 11-14). However, the court will consider the evidence on which plaintiff

relies in arguing that the last prong of the pain standard is satisfied (see Doc. # 11, pp. 13-14)

to determine whether it impeaches the reasons articulated by the ALJ for her credibility

determination.

Plaintiff contends that the following evidence demonstrates that the ALJ erred in her

credibility assessment: (1) on October 11, 2006, plaintiff reported that an epidural injection

had not relieved her pain (Doc. # 11, p. 14, citing R. 196); (2) on December 10, 2008, she

had chest pain, and a stress test revealed "hypertensive heart disease" (id., citing R. 278);

(3) "it was noted that [she] was developing 'severe re[]trosternal, very typical a[n]ginal-like

chest discomfort, radiating into the left upper extremity associated with dyspnea,

nausea . . . .'" (id., citing R. 308[4]); (4) on March 10, 2009, she complained of right-sided low

back pain; she was diagnosed with psoriasis, which can be associated with sacroiliitis (id.,

citing R. 321); (5) at that time, "it was also noted that [her] mechanical right-sided low back

pain was complete with extension into the lower extremities" and plaintiff "was referred for

a right sacroiliac joint injection as the result of this office visit" (id., citing R. 321);

(6) plaintiff's medication list dated March 2009 notes several medications including Ultram,

---

[4] The page of the transcript cited by plaintiff is incorrect. It appears she intended to cite R.
278, the stress test report.

"a narcotic-like pain reliever used to treat moderate to severe pain" and Zanaflex, "a muscle relaxer used to treat spasticity" (id., citing R. 326); and (7) her testimony regarding her symptoms is consistent with treatment notes demonstrating that she "reported experiencing chest pains, headaches, chronic back pain, gastric ulcers, arterial venous disease, GERD, sciatica, COPD, fatigue, [] hip pain . . . depression, anxiety, insomnia, and fatigue as a result of her impairments (id. at p. 13, citing R. 207-40, 286-301 (Dr. Chandler's treatment notes)).[5]

In October 2008, plaintiff reported that her pain is brought on by walking, lifting, standing, lying in bed and "sitting very long" and that it "[n]ever goes away." (R. 131). At the administrative hearing, plaintiff testified that the pain that she experiences most is in the middle of her back and down her legs, and that it is at a level of "at least an eight" on a scale of ten on an average day. She stated that she can stand "[a]bout thirty minutes" before she has to change positions, walk for "about thirty-five or forty minutes" (but she has to "stop a lot in between"), and sit for "[p]robably about ten or fifteen minutes" before she has to change positions. She testified that she "can't lift or stoop." (R. 38-39). She stated that she

---

[5]   As plaintiff argues, she testified at the hearing "that she was terminated from her job at Walmart for chronic absences due to stomach ulcers and bowel problems." (Plaintiff's brief, Doc. # 11, p. 13)(citing R. 40). However, she further testified that she is taking medication "[a]nd it's helping. There is certain foods I can't eat and stuff." (R. 40). The ALJ cited this testimony, and the medical evidence of record, in concluding that plaintiff's gastric symptoms cause no more than a moderate limitation on her ability to concentrate (R. 18)(citing Exhibits 2F, 6F, 15F, and 18F). In plaintiff's disability report, she did not contend that gastrointestinal symptoms limit her ability to work. Instead, plaintiff claimed that she "was terminated from her job due to frequent absences because of [her] back pain." (R. 114; see also R. 288 (plaintiff's report to Dr. Chandler in January 2009 that she "quit work last Feb 2008 because of low back pain"). Plaintiff does not assert any serious challenge to the ALJ's consideration of her gastrointestinal symptoms; the court, accordingly, does not discuss it further.

does "very little" housework and cooking, "just not very much at all, and just once in a great while [she will] do something."  (R. 36).

The ALJ did not reject plaintiff's pain testimony completely. She found plaintiff to be limited to less than a full range of *sedentary* work, thereby acknowledging that plaintiff has significant functional limitations. The ALJ determined that, while plaintiff can lift, sit, stand and walk to the extent required by sedentary work, she should "never push and pull with the lower extremities due to her complaints of lower back/leg pain" and she has "moderate deficits in concentration as a result of her pain and fatigue." (R. 18, 19). In assessing plaintiff's allegations of pain in her lower back, legs and hips, the ALJ observed that, while plaintiff testified that Tramadol does not relieve her pain, she "has essentially received only three examinations in 2009 and there is no change in her medication at all." (R. 17).[6]  Plaintiff saw Dr. Chandler three times in 2009, once to have disability forms completed. Additionally, she was examined by Dr. LaCour, a rheumatologist, for her complaints of pain on March 10, 2009. The records demonstrate that plaintiff's dosage of Tramadol remained the same, as the ALJ indicated, during this period.  (R. 287-88, 321-22, 326, 343-45).[7]

The ALJ further noted that, while Dr. Chandler diagnosed chronic low back pain in

---

[6]  Plaintiff had more than three medical examinations in 2009, but the ALJ here addresses plaintiff's treatment for low back pain.

[7] The medical records include Ultram and its generic equivalent, Tramadol, at a dosage of 50 mg every six hours.  Dr. Chandler first prescribed this medication, at the same dosage, in April 2008.  (R. 212, 287, 326, 344; see *Physician's Desk Reference* (65th ed. 2011, p. 124)).

office visits in 2009, there is no indication of any ongoing signs or symptoms. (R. 17). This observation is supported by the record; although Dr. Chandler recorded plaintiff's complaints of pain, Dr. Chandler performed physical examinations on each office visit in 2009 and, also, in October 2008, and she recorded no clinical findings of abnormalities, except for psoriasis on plaintiff's elbow in January 2009. (R. 288, 289, 343, 345). The ALJ also reasoned that plaintiff's "treatment of her pain symptoms even prior to 2009 is not consistent with the extent of her allegations of back pain." (R. 17). The ALJ cited plaintiff's October 2008 examination by Dr. Kesserwani, a neurologist, for complaints of pain, numbness and tingling in her feet, lower legs, hands and arms, and "a lot of hip pain going down the legs" and Dr. Kesserwani's observation that plaintiff was able to stand on her heels and toes. The ALJ also noted Dr. Kesserwani's conclusion that "this is mononeuritis multiplex and it is low grade" and that, although Dr. Kesserwani requested that plaintiff return in a few weeks, she did not do so. (R. 17). Dr. Kesserwani recorded plaintiff's report that she "had a nerve conduction study at Flowers of the legs, told she had mononeuritis multiplex." (R. 242). He noted no abnormalities in his physical examination, and stated, "Clinically, I do not find evidence of a polyneuropathy." (R. 243). While his assessment also included that the "[n]erve conduction study and EMG done at Flowers revealed a mononeuritis multiplex[,]" Dr. Kesserwani followed this assessment with his plan of action:

> 1) I will need to look at the nerve test and know what the exact numbers are, I need to know the sensory amplitudes and velocities.
> 2) She may go to Flowers Hospital to pick up the report as this is not usually published by the lab at Flowers. Patient has to physically pick up the report;

they do not fax it for some unknown reason.

3) This is a mononeuritis multiplex and it is low grade.

4) She has episodic migraine.  We will consider a migraine preventive.

5) I advised her to come back in a couple of weeks.  Get me the numbers of the nerve testing and then I will make further recommendations.

6) Of note, she is already applying for disability, I think this is premature based on the information that I have.  Further action to depend on what the nerve test shows.  I will look at that and then will decide where to go.  Mononeuritis multiplex is usually a low-grade vasculitis.  Further action to depend upon what I find.

(R. 243-44).  Dr. Kesserwani's records include no indication that plaintiff brought him the nerve conduction study results, as he had requested, or that she returned for follow-up.  (See Exhibit 6F, R. 241-46).[8]

In discounting plaintiff's pain allegations, the ALJ also cited plaintiff's evaluation by Dr. LaCour.  She noted his discussion of a CT myelogram showing a mild diffuse disc bulge without nerve root impingement but, also, his observation that plaintiff's MRI of the lumbar spine and her EMG/NCV were unremarkable.  The ALJ further observed that Dr. LaCour recommended a discogram procedure but that plaintiff "also did not follow up with this

---

[8]  In its review of the record, the court has not located a copy of the Flowers Hospital nerve conduction study.  On September 30, 2008, Dr. Chandler scheduled plaintiff for an October 2, 2008 appointment with "Dr. Becker," and Dr. Kesserwani's report reflects that plaintiff was referred to him by "Dennis Becker, M.D." (R. 207, 242). Plaintiff indicated in the function report she completed on October 2, 2008 that she had an appointment with Dr. Becker later that day; the following day, she told the disability examiner that Dr. Becker would be doing an NCV on October 7, 2008. (R. 130, 133).  However, plaintiff did not include the nerve conduction study on the list of her medical tests in her disability appeal report  (Exhibits 2E,  9E; see R. 142, 144), and she did not submit Dr. Becker's records for consideration. See 20 C.F.R. § 1512(d); Ellison v. Barnhart, 355 F.3d 1272 (11th Cir. 2003)(Commissioner's duty to develop the record does not extend to evidence post-dating the application filing date.) Dr. LaCour – the rheumatologist who examined the plaintiff in March 2009 – observed that plaintiff's extensive evaluation "includ[ed] a basically unremarkable EMG/NCV of the lower extremities[.]"  (R. 322).

treatment." (R. 17-18).  In his "History and Physical" report, Dr. LaCour noted plaintiff's

complaints of low back pain and "right sacroiliac joint region pain, unprovoked" which "can

radiate into both lower extremities, is aggravated by weight bearing, but does not necessarily

improve much with sitting." He wrote:

> Pain does not seem to improve with ambulation. [T]o the contrary, after walking about 30 minutes, she has to generally stop because of aggravation of pain in both the right low back and in the lower extremities. She is not complaining of any significant paresthesias in the lower extremities, nor does she have any weakness. Her evaluation has been extensive, including a basically unremarkable EMG/NCV of the lower extremities, unremarkable MRI of the lumbar spine, unremarkable non-invasive lower extremity arterial study, bone scan showing mild degenerative uptake in the knees and right ankle. CT myelogram showing mild diffuse broad based disc bulge at L4-L5, but no nerve root impingement.  CBC and CMP were within normal limits. Rheumatoid factor was borderline positive around 17.  She has no peripheral joint complaints.  History is notable for psoriasis, however.

(R. 322).

On physical examination, Dr. LaCour observed that plaintiff was in "no acute

distress" and that she had "[e]xcellent, pain-free range of motion throughout the upper

extremity" and "[e]xcellent motion of both hips as well as knees, ankles, feet."  He noted

"some soft tissue tenderness to palpation across the low back," that she "complains of pain

in the right back area with range of motion in the right hip," and "psoriatic plaques . . . at the

base of the right palm, left elbow" but he noted no other abnormalities.  (R. 321). He

assessed:

> Mechanical right-sided low back pain with extension into the lower extremities – etiology is unclear, but I would favor discogenic origin as opposed to an inflammatory process.  Patient does not have rheumatoid arthritis and we can

dismiss the borderline positive rheumatoid factor as a false positive test. However, she does have psoriasis, which can be associated with sacroiliitis. Her symptoms are not consistent with inflammatory process, but nonetheless, this could be an atypical presentation.  I do think that further evaluation is in order.

(R. 321).  Dr. LaCour ordered a CT scan of plaintiff's sacroiliac joints and other tests; he also indicated that he would set up a right sacroiliac joint injection.  He concluded, "Regardless of the test results, should she notice dramatic improvement in pain with the sacroiliac joint injection, a presumptive diagnosis of psoriatic arthritis could be made and we might ultimately want to pursue anti-TNF therapy.  Should there be no significant improvement with a sacroiliac joint injection, I am recommending that she consider a discogram, which would at least help establish the source of pain.  Whether or not she had anything further done beyond this, would have to be discussed with Dr. Barnard."  (R. 321).  Dr. LaCour's records include the results of the CT scan performed the following week – "[t]he sacroiliac joints appear[ed] normal with no evidence of sclerosis or erosion" and "no evidence of trabecular disruption."  The radiologist's conclusion was "No abnormality identified in the bony pelvis/sacroiliac joints."  (R. 320).  Plaintiff's other lab results are in Dr. LaCour's records (R. 325, 329) but there is no indication that she had the sacroiliac joint injection or the discogram, or that she returned to Dr. LaCour for follow-up.  (Exhibit 16F).

Dr. Barnard's records reflect that he evaluated plaintiff on May 14, 2008 – her first office visit with him since November 2006 – and that his examination revealed a negative straight leg raise, good pulses, and "[n]o focal motor or strength deficits, reflex asymmetry,

or sensory changes." He noted that "her most recent MRI is normal again" and stated, "As I explained to her, she is really at the same stage that she was the last time I talked to her. I again discussed discography with her, but I have also emphasized to her that this is a completely elective test and the results are anything but guaranteed to be good." (Exhibit 3F, R. 194). The reasons stated by the ALJ for discounting plaintiff's complaints of back, leg and hip pain are adequate and supported by substantial evidence of record.

Plaintiff points to the evidence that, on December 10, 2008, she had chest pain, and a stress test revealed "hypertensive heart disease" and "it was noted that [she] was developing 'severe re[]trosternal, very typical a[n]ginal-like chest discomfort, radiating into the left upper extremity associated with dyspnea, nausea . . . .'" (Doc. # 11, p. 14)(citing R. 278, 308).[9] The ALJ acknowledged that plaintiff's cardiologist, Dr. Alfano, "did note that the claimant reported chest pain and tightness described as typical anginal-like pain as had Dr. Chandler approximately two months earlier." (R. 19). However, the ALJ observed that the stress test showed "no evidence of ischemia or injury with an excellent degree of stress obtained," that "Dr. Alfano stated that except for some mild diastolic dysfunction, [plaintiff's] transthoracic echocardiogram performed in December 2008 was 'completely normal[,]'" and that he "reported that Dr. Chandler apparently has requested that the claimant begin an exercise regimen." (Id.). The ALJ cited Dr. Chandler's treatment notes indicating

---

[9] The description of chest pain quoted by plaintiff in her brief was in the stress test report, and referred to plaintiff's physiological reaction during the Dobutamine exercise stress test, not to symptoms occurring at another time. (See R. 278). As noted previously, plaintiff's citation to page 308 of the transcript appears to be an error.

that plaintiff had mild arterial venous disease but also had a normal chest x-ray. (Id.).[10]  She further noted that Dr. Alfano stated that, "as long as [plaintiff's] blood pressure would remain controlled and she has abatement of her symptoms, she should follow-up with him only on a six month basis" and that, "despite [plaintiff's] insistence that she has chest pain and some cardiac involvement at the hearing, [she] has not returned to Dr. Alfano since January 2009" and has received little treatment for any cardiovascular problem other than this treatment by Dr. Alfano.  (R. 19)(citing Exhibits 12F, 13F, and 20F).

Dr. Alfano summarized plaintiff's symptoms and stress test results in his notes for plaintiff's follow-up visit on January 20, 2009, including plaintiff's pharmacological stress-induced chest pain during the test, the "absolutely normal" SPECT images "with no evidence of ischemia nor injury with an excellent degree of stress obtained" and "completely normal regional left ventricular wall motion, excellent contractility, and ejection fraction 62%."  He noted that "[s]he continues to have anginal-like symptoms," that "she is on no antianginal medications nor is she on any antihypertensive therapy whatsoever[,]"and that "Dr. Chandler apparently has already asked her to get on to an exercise regimen as she has gained quite a bit of weight."  He assessed ANCA/cardiac syndrome X.  He started plaintiff on medications, advised her to record her blood pressure and heart rate twice daily and to bring her diary to his office after two weeks, and stated that he would "notify her as to whether there needs to be any changes."  He concluded, "As long as her BP remains controlled and she has

---

[10]  See R. 290, 291.

abatement of her anginal-like symptoms, then will continue to follow her on a 6 month basis unless she needs to see me sooner."  (R. 271).

At the hearing, plaintiff testified that she went to see her "heart doctor" two days previously and he "put [her] on inhalers." (R. 34).  While plaintiff may have been referring to Dr. Alfano, she did not identify him by name.  (Id.). The ALJ may very well have been mistaken when she observed that plaintiff had "not returned to Dr. Alfano since January 2009."  However, the medical record before the ALJ did not include any treatment notes from Dr. Alfano after the January 2009 follow-up appointment – not even a notation about the blood pressure and pulse diary plaintiff was to have brought to Dr. Alfano in two weeks. (Exhibit 12F). Plaintiff submitted Dr. Alfano's records to the Office of Disability Adjudication and Review on March 24, 2009 (R. 270) – two months after her January 2009 follow-up visit to Dr. Alfano – and she did not seek to supplement the record thereafter with additional treatment notes from him, either before or after the hearing.

Plaintiff testified that she gets chest pains when she has anxiety attacks and that her anxiety attacks are more frequent when she is out in public, as she becomes "stressed out" or "real nervous." (R. 35).  She testified that she had anxiety attacks more frequently when she was working at Walmart and was out in the public more often. (R. 39).  The ALJ noted that, during her consultative psychological examination with David Ghostley, Psy.D., plaintiff reported some crying spells and depressed mood but mentioned nothing about having anxiety attacks. The ALJ also pointed to plaintiff's testimony that she visits with

15

neighbors once a week, plaintiff's report to her counselor that she traveled out of state during Thanksgiving 2009, and Dr. Ghostley's conclusion that plaintiff is impaired only mildly to moderately in her ability to respond appropriately to supervisors, coworkers, and work pressures.  (R. 19-20).  The ALJ credited plaintiff's testimony of anxiety and panic attacks to a large extent, finding that she was "limited to low stress (occasional decision making, judgments, or changes in the work setting)" and that she "can have no interaction with the public[.]" (R. 15).  As the ALJ noted, plaintiff's testimony regarding the frequency of her anxiety attacks was not clear. (R. 19, 35-40).  The ALJ's stated reasons for declining to find plaintiff's anxiety attacks to preclude low stress work with no interaction with the public are supported by substantial evidence of record.  (See R. 37, 247-49, 354).

In her pain questionnaire, plaintiff reported that she has taken Zanaflex and Tramadol for pain since June 2008 and that they cause her to become tired.  (R. 131-32).[11]  At the hearing, plaintiff testified that her pain medications make her drowsy and she spends four or five hours a day napping or lying down.  (R. 35, 38).  The ALJ noted that drowsiness is the only side effect plaintiff identified for Zanaflex, but that plaintiff takes her Zanaflex only at bedtime; she also observed that plaintiff did not report drowsiness from Tramadol during treatment, or even when asked to report the side effects of medication in her disability reports.  (R. 16).  The ALJ further noted that, although plaintiff listed drowsiness as a side effect of the Elavil and Lorazepam prescribed by Dr. Chandler for depression and anxiety,

---

[11]  The record reflects that Dr. Chandler first prescribed Ultram and Zanaflex in April 2008. (R. 212).

plaintiff also did not report these side effects during her treatment. (R. 19). These observations are substantiated by the record. (See R. 131-32, 118 (stating "none" as to side effects from pain medication); Exhibits 5F, 13F, 20F (Dr. Chandler's records); see also Colon ex rel. Colon v. Commissioner of Social Security, 2011 WL 208349, *2 (11th Cir. Jan. 25, 2011)(unpublished opinion)(ALJ's decision not to credit plaintiff's allegations of side effects from medication supported by substantial evidence where plaintiff did not complain of side effects to his physicians and none of plaintiff's doctors reported medication side effects)). As the Commissioner argues (see Doc. # 12, p. 13), plaintiff's testimony regarding drowsiness from medications and her need to lie down for four to five hours each day is contradicted by plaintiff's treating physician, Dr. Chandler. While Dr. Chandler indicates in the disability forms she completed in March 2009 that plaintiff has extreme functional limitations (see Exhibit 17F), her response to the question about medication side effects is that "[s]ome limitations may be present but not to such a degree as to create serious problems in most instances." (R. 331). Dr. Chandler also expressed her opinion that plaintiff can "[f]requently" operate motor vehicles. (R. 332). The ALJ did not err by declining to credit fully plaintiff's allegations of medication side effects.

The ALJ articulated adequate reasons, supported by substantial evidence of record, for declining to accord full credit to plaintiff's allegations regarding the limiting effects of her symptoms. The evidence cited by plaintiff in her argument challenging the ALJ's application of the pain standard (see Doc. # 11, pp. 13-14) does not demonstrate otherwise.

<u>Treating Physician's Opinion</u>

Dr. Chandler, plaintiff's primary treating physician, completed physical capacities evaluation and clinical assessment of pain forms on March 26, 2009. (Exhibit 17F, R. 331-32). She expressed her opinion that plaintiff can lift one pound frequently and five pounds occasionally, and that she can sit for one hour and stand or walk for one hour in an eight hour work day. Dr. Chandler indicated that plaintiff can perform fine manipulation only occasionally, gross manipulation only rarely, and that she can never push and pull with her arms or legs, cling or balance, bend or stoop or reach overhead, or work with or around hazardous machinery. She stated that plaintiff can frequently operate motor vehicles and that she can tolerate frequent exposure to "[e]nvironmental problems (allergies, dust, etc.)[.]"[12] Dr. Chandler indicated that plaintiff was likely to be absent from work more than four days per month as a result of her impairments or treatment. (R. 332). In the space following the prompt, "Please explain and briefly describe the degree and basis for any restriction checked above[,]" Dr. Chandler made no entry. However, across the bottom of the page, she wrote, "Patient states she is not able to do anything[.]" (<u>Id</u>.). In the clinical assessment of pain form, Dr. Chandler circled responses to indicate that "[p]ain is present to such an extent as to be distracting to adequate performance of daily activities or work[,]" that it would be "[g]reatly

---

[12]  The form suffers from a lack of clarity in some respects. However, the question to which Dr. Chandler responded did not ask how often plaintiff experienced environmental problems but, instead, "How often can your patient perform the following activities?" (R. 332). "Environmental problems (allergies, dust, etc.)" is one of the listed "activities." (<u>Id</u>.). Plaintiff concurs with the court's understanding of Dr. Chandler's response. <u>See</u> Plaintiff's brief, Doc. # 11, p. 7 (noting that Dr. Chandler indicated that plaintiff "can frequently be exposed to environmental hazards").

increased . . . and to such a degree as to cause distraction from tasks or total abandonment

of task" by "physical activity, such as walking, standing, sitting, bending, stooping, moving

of extremities, etc.[,]" and that side effects of prescribed medications would cause "[s]ome

limitations" on plaintiff's ability to perform her work, "but not to such a degree as to create

serious problems in most instances." (R. 331).  Below her signature, and without a prompt,

Dr. Chandler printed, "Pt STATES HER PAIN IS SEVERE."  (R. 331).

　　　　Plaintiff contends that Dr. Chandler "is clearly a treating physician whose opinion and

recommendations should have been given controlling weight." (Doc. # 11, p. 8).  She argues:

> In her decision, the ALJ gave little weight to the conclusions of Dr. Chandler
> as set forth in her March 2009 Physical Capacity Assessment (Tr. 20).  The
> ALJ opined that the limitations set forth by Dr. Chandler "are not consistent
> with her treatment notes and the other medical evidence" and that "the
> identified limitations seem to be based primarily on the claimant's opinion"
> (Tr. 20).  Based on the abovementioned reasoning, the ALJ gave "substantial
> weight to Dr. Ghostley's assessment" (Tr. 21).

(Doc. # 11, p. 8).[13]  As an initial matter, the court notes that the form completed by Dr.

Chandler is entitled "PHYSICAL CAPACITIES EVALUATION" and explains, in an

introductory paragraph, that it pertains to the "patient's ability to do work related physical

activities[.]"  (R. 332).  Plaintiff's argument is specious to the extent that she suggests that

the ALJ chose to credit Dr. Ghostley's consultative *psychological* assessment over Dr.

---

[13]  Plaintiff argued, initially, that "the Commissioner's decision should be reversed, because
the ALJ *failed to evaluate* the medical opinions expressed by Ms. Wines' treating physician, Dr.
Connie Chandler." (Plaintiff's brief, Doc. # 11, p. 6)(emphasis added). The ALJ did, in fact, evaluate
Dr. Chandler's opinion – as is demonstrated by the ALJ's decision (see R. 20) and by the portion of
plaintiff's argument quoted here.

Chandler's *physical capacities* assessment in determining the extent of plaintiff's physical limitations. While it is true that the ALJ assigned "great weight" to Dr. Ghostley's psychological assessment, there is no indication whatsoever that her decision to do so was "based" to any extent on her "abovementioned reasoning" regarding the consistency of Dr. Chandler's assessment of plaintiff's physical capacity with Dr. Chandler's treatment notes and the other medical evidence of record, or her conclusion that the opinions Dr. Chandler expressed in Exhibit 17F "appear to be based primarily upon the claimant's opinion[.]" (See R. 20-21).

Although plaintiff does not mention this part of the ALJ's analysis (see Doc. # 11, p. 8), the ALJ gave great weight – in the paragraph immediately preceding her discussion of the weight she was giving to Dr. Chandler's assessment in Exhibit 17F – to the opinion of Dr. Kesserwani, the neurologist to whom plaintiff was referred for evaluation and treatment in October 2008. (R. 20). The ALJ found that Dr. Kesserwani's opinion that plaintiff's "application for disability is premature based on the information that he was able to ascertain including his examination findings," was "consistent with the medical evidence and well supported by Dr. Kesserwani's clinical findings." (R. 20). The ALJ then turned to Dr. Chandler's opinion as expressed in the physical capacities evaluation and clinical assessment of pain forms. She stated:

> [L]ittle weight is given to the opinion of Dr. Chandler in Exhibit 17F. While her opinion regarding the claimant's physical limitations and pain have been considered by me, her limitations are not consistent with her treatment notes and the other medical evidence. The identified limitations, which also appear

to be based primarily upon the claimant's opinion, are provided little support
by Dr. Chandler's treatment notes.  Dr. Chandler stated specifically "patient
states she is not able to do anything," and "patient states her pain is severe."

(R. 20).

Dr. Chandler began treating plaintiff in early 2005 and continued to do so through the
date of the administrative hearing.  (Exhibits 5F, 13F, 20F, 21F).  Her notes report plaintiff's
various complaints of symptoms, including pain, and Dr. Chandler's diagnoses and
treatment.  They also reflect that Dr. Chandler performed physical examinations each time
she saw the plaintiff.  (Id.).  Dr. Chandler did not evaluate plaintiff in the five months leading
up to January 22, 2008, the date of an office visit preceding plaintiff's alleged onset date by
seventeen days.  (Exhibit 5F, R. 214-18).  Plaintiff sought treatment from Dr. Chandler eight
times in office visits during the period from January 2008 through October 2009.  (Exhibits
5F, 13F, 20F).

On January 22, 2008,  Dr. Chandler noted no abnormal clinical findings in plaintiff's
physical examination. (R. 214). The same is true of the examinations Dr. Chandler performed
in April 2008, October 2008, March 2009 and October 2009. (R. 212,  289, 343, 345).  On
July 3, 2008, plaintiff complained of "bad migraine headaches, back of head + neck[.]"  Dr.
Chandler noted bilateral tenderness of the paraspinal muscles in plaintiff's neck and her
examination of plaintiff's eyes was positive for photophobia. (R. 210).  Dr. Chandler next
evaluated plaintiff on September 30, 2008, just over a week after plaintiff filed the present
disability examination.  Dr. Chandler notes findings of "dry vaginal mucosa" on pelvic

examination, a small area of psoriasis on plaintiff's suprapubic area, psoriasis of her left elbow, and constipation.  She also notes plaintiff's complaints of migraine headaches.  She states, "ROS otherwise negative."  (R. 207).  At the top of the page, she writes, "UGI - DX: gastric ulcers Feb'08" and "pinched nerve – recommend surgery."[14]  On this visit, Dr. Chandler diagnosed:

    1) Pap
    2) Fatigue
    3) Lumbar DDD [with] radiculopathy
    4) Psoriasis [left] elbow
    5) Migrane [sic] HAs
    6) dysparesis
    7) Constipation
    8) Gastric Ulcers

(R. 207).  She scheduled plaintiff for an appointment with Dr. Becker.  (Id.).[15]

    In her treatment note for January 19, 2009, Dr. Chandler noted no abnormalities in the sections of her form designated for physical examination, including that for "Skin[.]" Instead, she marked boxes indicating that plaintiff's skin was warm, dry and pink and that it was "[i]ntact." (R. 288). However, under the section entitled "Plan of Care[,]" Dr. Chandler wrote, "Arthritis Profile" and "Psoriasis on [left] elbow."  (R. 288).  Thus, Dr. Chandler's

---

[14]  The latter note does not include a citation to objective testing or clinical findings, and the court has located no objective testing supporting a finding of "pinched nerve."  It is not among Dr. Chandler's numbered diagnoses and, accordingly, it is not clear that Dr. Chandler was diagnosing a "pinched nerve" in September 2008.  (See R. 207).

[15]  As noted above, the transcript includes no records from Dr. Becker. (See n.7, *supra*). However, Dr. Kesserwani (who believed plaintiff's application for disability to be "premature") saw plaintiff on referral from Dr. Becker (R. 242-44), and Dr. LaCour notes that plaintiff's EMG/NCV was "basically unremarkable" (R. 322).

treatment notes record abnormal clinical findings in only three of the eight physical examinations she conducted during plaintiff's office visits between January 2008 and October 2009.  Dr. Chandler also evaluated plaintiff when she admitted plaintiff to the hospital on September 25, 2009, after plaintiff reported to the emergency room with an acute exacerbation of COPD.  Dr. Chandler noted that plaintiff is a smoker and had diffuse wheezing.  In her "Review of Systems," Dr. Chandler wrote, "She has chronic low back pain and frequent medical evaluations for this.  She has been trying to get on disability for a couple of years." (R. 347).  The sole abnormal clinical finding Dr. Chandler recorded, upon her physical examination of the plaintiff, was "[e]xpiratory wheezes."  Plaintiff improved on treatment with IV antibiotics and steroids and she was discharged home on September 28, 2009 on respiratory therapy.  (R. 347-48).

Dr. Chandler's records include reports of an MRI of plaintiff's lumbosacral spine and x-rays of plaintiff's left hip that Dr. Chandler ordered in response to plaintiff's complaints of pain in April 2008.  The radiologist interpreted the MRI to show "[v]ery minimal scolisis" and to be an "[o]therwise normal MRI of the lumbar spine" – beside these impressions, Dr. Chandler wrote, "Normal[.]" (R. 211).  She further noted that "pt. told MRI lumbar spine – Normal." (Id.).[16]  The two x-ray views of plaintiff's left hip also failed to reveal any abnormality; on this report, Dr. Chandler wrote, "Spoke [with] pt. told X-Ray O.K."

---

[16] Plaintiff's previous lumbar spine MRI, in August 2006, was also "O.K." according to Dr. Chandler's note.  (R. 225).

(R. 213).   Plaintiff told Dr. Chandler on October 9, 2008 that she had noticed numbness and tingling in her left arm for the previous week. (R. 289). The chest x-ray Dr. Chandler ordered on that day was normal.  (R. 291).[17] The noninvasive bilateral lower extremity arterial study that Dr. Chandler ordered in October 2008 also was "OK" – according to Dr. Chandler – showing only "a small amount of small vessel disease in feet [and] none in legs."  (R. 290). In January 2009, plaintiff reported to Dr. Chandler that her feet "tingle all the time" and Dr. Chandler diagnosed, *inter alia*, "Paresthesias feet[.]"  (R. 288).  However, when Dr. LaCour – the rheumatologist – examined plaintiff two months thereafter, plaintiff was "not complaining of any significant paresthesias in the lower extremities, nor does she have any weakness." (R. 322).  Dr. LaCour summarized plaintiff's previous work-up to include: "unremarkable EMG/NCV of the lower extremities, unremarkable MRI of the lumbar spine, unremarkable non-invasive lower extremity arterial study, bone scan showing mild degenerative uptake in the knees and right ankle[,] CT myelogram showing mild diffuse broad based disc bulge at L4-5, but no nerve root impingement[,] CBC and CMP were within normal limits."  (Id.)  He further noted that plaintiff's history was notable for psoriasis, but that she "has no peripheral joint complaints."  (Id.). He dismissed her borderline positive rheumatoid factor of "around 17" as a "false positive test."  (R. 321-22).

_____

[17]   Dr. Chandler also ordered an EKG (see R. 289), but the court did not locate a report for an EKG performed in or around October 2008 in Dr. Chandler's records. However, Dr. Alfano (plaintiff's cardiologist) interpreted plaintiff's December 2008 transthoracic echocardiographic examination to be "[e]xcept for some mild diastolic dysfunction . . . for all intents and purposes . . . completely normal."  (R. 281).

As noted previously, plaintiff's subsequent examination by Dr. Barnard, on May 14, 2008, revealed good pulses, no focal or motor strength deficits, no reflex asymmetry or sensory changes, and a negative straight leg raise. (R. 194). Plaintiff first sought treatment from a chiropractor, Dr. Allen Conrad, on May 14, 2008. (R. 205; see also R. 121). When she next appeared for treatment, on May 19, 2008, plaintiff reported no improvement in her hip, leg and back pain. (R. 204). Dr. Conrad modified her therapy and, the following day, plaintiff reported a 20% improvement in her pain. (R. 204). However, she did not return to Dr. Conrad for further treatment. (Exhibit 4F).

"If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight." Roth v. Astrue, 249 Fed. Appx. 167, 168 (11th Cir. 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)). "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)). "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." Pritchett v. Commissioner, Social Security Admin, 315 Fed. Appx. 806 (11th Cir. 2009)(unpublished opinion)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir.

1986)).  "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error.  Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

To support her argument that the reasons the ALJ articulated for giving Dr. Chandler's physical capacity assessment and clinical assessment of pain little weight are "inadequate," and that "the ALJ improperly concluded that Dr. Chandler's opinions are not supported by her treatment notes," plaintiff provides a summary of Dr. Chandler's treatment notes. (Doc. # 11, pp. 9-10). That summary is telling. For office visits in May, August and November 2006 and July 2007, plaintiff describes only her complaints and Dr. Chandler's diagnoses. (Id., p. 10). Regarding plaintiff's office visit to Dr. Chandler in April 2008, plaintiff states that she "presented to Dr. Chandler with complaints of back pain" and that "[a]n MRI performed revealed 'mild scoliosis.' (Tr. 211)." (Id.). She further notes that Dr. Chandler prescribed medications including Zanaflex. (Id.).[18] In quoting the radiologists' impression, plaintiff has distorted it slightly – Dr. Terrell assessed "[v]ery minimal scoliosis[,]" not "mild scoliosis." (R. 211). Additionally, plaintiff ignores Dr. Chandler's

_____

[18] Plaintiff states that she "presented to Dr. Chandler with complaints of back pain" on April 24, 2008 and, again, on April 22, 2008. (Doc. # 11, p. 10). The record reflects that plaintiff saw Dr. Chandler once in April 2008, on April 22nd. (R. 212). Dr. Chandler ordered a lumbar spine MRI, which was performed at Dale Medical Center two days later, on April 24, 2008. The MRI report was signed by Dr. Terrell on April 25, 2008 and reported to plaintiff by Dr. Chandler on April 28, 2008. (R. 211). Plaintiff did not see Dr. Chandler again until July 3, 2008. (R. 210).

handwritten notation interpreting the MRI report as "Normal" and her note stating that she told plaintiff that the MRI of her lumbar spine was "Normal[.]" (Id.).

Finally, plaintiff observes that she "reported to Dr. Chandler with chronic low back pain" on January 19, 2009 and that, on January 27, 2009, abnormal labs prompted Dr. Chandler to order an arthritis profile. (Id., citing R. 288, 299). Plaintiff's description of the record is, again, slightly inaccurate; it also omits any reference to the subsequent opinion of a rheumatologist dismissing the abnormal lab result as a false positive test. Plaintiff reported to Dr. Chandler on January 19, 2009 "to discuss labs" and for refills on her medications; she also wanted to request a change from Vytorin to "something cheaper." (R. 288). During the visit, plaintiff told Dr. Chandler that she "[q]uit work last Feb 2008 because of low back pain[.] Can't lift heavy stuff because it hurts her back[.] Feet tingle all the time – [.]" (Id.). Dr. Chandler's treatment note indicates that she ordered an arthritis profile on that visit, not (as plaintiff represents) on January 27, 2009 as a result of abnormal labs. (Id.). After Dr. Chandler received the result of the arthritis profile, which included an indication of a positive rheumatoid arthritis factor, Dr. Chandler referred plaintiff to Dr. LaCour, the rheumatologist. (R. 295-301). Dr. LaCour dismissed the lab result as a "false positive test" and concluded that plaintiff "does not have rheumatoid arthritis[.]" (R. 321).

The ALJ's conclusion that the opinions and limitations Dr. Chandler expressed in Exhibit 17F "are not consistent with her treatment notes and the other medical evidence" (R. 20) is well supported by the evidence of record, including the evidence cited by plaintiff.

As the ALJ indicates – and as demonstrated above – the limitations in Exhibit 17F "are provided little support by Dr. Chandler's treatment notes." (Id.).  The ALJ further relied on Dr. Chandler's written statements on the physical capacities evaluation and clinical assessment of pain forms that "Pt STATES HER PAIN IS SEVERE" and "Patient states she is not able to do anything[.]" (See R. 20; see also R. 331, 332).  The ALJ concluded, from Dr. Chandler's statements, that the limitations Dr. Chandler identified "appear to be based primarily upon the claimant's opinion[.]" (R. 20).  The ALJ's conclusion in this regard is supported by Dr. Chandler's prominent notes on both forms.  (R. 331, 332).  The court has determined, above, that the ALJ did not err in declining to credit plaintiff's subjective complaints of pain and other symptoms to the extent that they would preclude sedentary work as described by the ALJ in her residual functional capacity assessment.

The Eleventh Circuit has found good cause for discounting a treating physician's report when the report "'is not accompanied by objective medical evidence or is wholly conclusory.'"  Crawford, supra (quoting Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir.1991)). Additionally, there is good cause where the treating physicians' opinions are "inconsistent with their own medical records,"  Roth, supra (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) or "when the opinion appears to be based primarily on the claimant's subjective complaints of pain."  Freeman v. Barnhart, 220 Fed. Appx. 957, 960 (11th Cir. 2007)(citing Crawford, supra).  "The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.  Carson v. Commissioner of Social Sec.,

373 Fed. Appx. 986, 988 (11th Cir. Apr. 20, 2010)(citing <u>Sryock v. Heckler</u>, 764 F.2d 834, 835 (11th Cir. 1985)).  Plaintiff's allegation that the ALJ erred in evaluating Dr. Chandler's opinion regarding her limitations is without merit.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the ALJ did not, as plaintiff contends, commit reversible error in evaluating Dr. Chandler's opinion or in applying the pain standard.  Accordingly, the decision of the Commissioner is due to be AFFIRMED.  A separate judgment will be entered.

DONE, this 2nd day of March, 2012.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE